GEORGIA INTERNATIONAL LIFE INSURANCE COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 7633–80.     Filed August 29, 1983.

---

*John M. Bixler* and *F. Brook Voght*, for the petitioner.
*Vallie C. Brooks* and *Thomas O'Rourke*, for the respondent.

OPINION

Scott, *Judge*: Respondent determined a deficiency in petitioner's income tax for calendar year 1971 in the amount of $691,729.61. The issue for decision is whether petitioner is entitled to carry over to 1971 any portion of its operations losses from 1963 and 1964, which is contingent upon whether the operations loss carryforward was absorbed entirely by petitioner's 1970 life insurance company taxable income. Resolution of the issue depends on whether petitioner's operating loss carryover reduced both ordinary and capital gain sources of its life insurance company taxable income when it used the section 802(a)(2)[1] alternative method in computing its 1970 income tax.

All of the facts have been stipulated and are found accordingly.

Georgia International Life Insurance Co. (petitioner) is a corporation which was organized under the laws of the State of Georgia on May 21, 1959. At the time of filing its petition, petitioner's principal place of business was in Atlanta, Ga. Petitioner filed its Federal income tax return on Form 1120L with the Internal Revenue Service Center, Chamblee, Ga. Petitioner computed its life insurance company taxable income on an accrual basis of accounting.

From 1959 through 1971, petitioner was a life insurance company within the meaning of section 801(a).[2] During those

---

[1] Unless otherwise stated, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect during the year here in issue.

[2] Sec. 801(a) provides:

SEC. 801. DEFINITION OF LIFE INSURANCE COMPANY.

(a) Life Insurance Company Defined.—For purposes of this subtitle, the term "life insurance company" means an insurance company which is engaged in the business of issuing life insurance and annuity contracts (either separately or combined with health and accident insurance), or noncancellable contracts of health and accident insurance, if—

years, petitioner sold life, accident, and related insurance in all the States and in 12 foreign countries; but the largest portion of its insurance business was in the southeastern United States.

Georgia International Corp., a non-life insurance company, owned all of petitioner's outstanding stock from December 31, 1967, until September 30, 1979. On October 1, 1979, Georgia International Corp. merged with Capital Holding Corp.; thereafter petitioner was the wholly owned subsidiary of Capital Holding Corp.

During calendar years 1959 through 1964, petitioner qualified as a "new company" within the meaning of section 812(e).[3] Under section 812(b), as a "new company," petitioner was entitled to an 8-year carryforward of losses from operations that it sustained in each of the years 1959 through 1964. For years subsequent to 1964, petitioner was entitled only to a 5-year carryforward of any loss from operations.

For calendar years 1959 through 1965, petitioner sustained losses from operations; for calendar years 1966 through 1969, without taking into account prior years' operations loss deductions, petitioner realized gains from operations. These gains and losses were as follows:

| Year | Gain/loss from operations |
|------|---------------------------|
| 1959 | ($218,299) |
| 1960 | (562,776) |
| 1961 | (966,798) |
| 1962 | (1,112,174) |
| 1963 | (1,445,456) |
| 1964 | (328,343) |
| 1965 | (239,950) |
| 1966 | 531,387 |
| 1967 | 95,099 |

(1) its life insurance reserves (as defined in subsection (b)), plus

(2) unearned premiums, and unpaid losses (whether or not ascertained), on noncancellable life, health, or accident policies not included in life insurance reserves,

comprise more than 50 percent of its total reserves (as defined in subsection (c)).

[3]Sec. 812(e) provides:

SEC. 812. OPERATIONS LOSS DEDUCTION.

(e) NEW COMPANY DEFINED.—For purposes of this part, a life insurance company is a new company for any taxable year only if such taxable year begins not more than 5 years after the first day on which it (or any predecessor, if section 381(c)(22) applies or would have applied if in effect) was authorized to do business as an insurance company.

1968  ......................  $379,615
1969  ......................  823,598

For calendar years 1960 through 1963, a portion of petitioner's losses was acquired by merger and for that reason was limited to a 5-year carryforward under section 812(b). The amounts of losses acquired by merger are as follows:

| Year | Portion of loss acquired by merger |
|------|-----------------------------------|
| 1960 ......................... | ($32,035) |
| 1961 ......................... | (157,286) |
| 1963 ......................... | (559,231) |

Under section 812(b), $841,027 of the 1962 loss of $1,112,174 cannot be carried over by petitioner to any year after 1970. The $239,950 loss sustained in 1965 cannot be carried over to any year after 1970.

Petitioner reported on its 1970 Schedule D annual statement that during the year, in 60 transactions, it sold, redeemed, or otherwise disposed of common stocks acquired prior to 1970. The statement further reflects that, in 21 transactions, petitioner sold or disposed of certain stocks acquired in 1970. The annual statement shows that, in 46 separate transactions, petitioner sold, redeemed, or otherwise disposed of bonds acquired prior to 1970 and, in 23 transactions, sold some bonds acquired during 1970. Petitioner reported on Schedule D, part 4, long-term capital gains from the sale of securities. The long-term capital gains included a gain of $35,201,814.50 from the December 15, 1970, sale to International Telephone & Telegraph of petitioner's 2,500 shares of Abbey International Corp. stock. Petitioner also reported $35,264,910.10 of taxable investment income and a $32,132,285.62 gain from operations. On its return, petitioner computed an operations loss deduction of $2,874,842.36 on Schedule E, calculated as follows:

| Calendar year | Operations loss deduction amount |
|---------------|----------------------------------|
| 1962 ...................... | ($1,080,918.18) |
| 1963 ...................... | (996,265.85) |
| 1964 ...................... | (318,042.13) |
| 1965 ...................... | (294,502.56) |

1966 ..................... ($79,798.86)
1967 ..................... (105,314.78)

Note - Although shown on line 22, Schedule E, the net operating losses have not been used in this return because of the alternative tax and are considered available for carryover.

On its 1970 tax return, petitioner computed its $9,527,538 income tax pursuant to the section 802(a)(2) alternative income tax method.[4] In addition, petitioner reported a surcharge of $238,188, which equaled $2\frac{1}{2}$ percent of the alternative tax amount.

Petitioner reported taxable investment income of $2,924,857.60 and gain from operations of $670,973.64 on its 1971 income tax return. The Schedule E calculation of gain from operations included an operations loss deduction of $1,499,421.62, composed of claimed operations loss deductions as follows:

| Calendar year | Operations loss deduction amount |
|---|---|
| 1963 | ($996,265.85) |
| 1964 | (318,042.13) |
| 1966 | (79,798.86) |
| 1967 | (105,314.78) |

Petitioner's 1971 Schedule D (attached annual statement, parts 4 and 5) reflects that petitioner entered into at least 150 transactions during the year 1971 to sell bonds acquired in prior years and that in more than 200 transactions, petitioner disposed of bonds acquired during 1971. The Schedule D further shows that petitioner sold, redeemed, or disposed of stock in more than 17 transactions in 1971. Petitioner reported a $3,302,766.63 short-term capital loss from such transactions.

---

[4]Petitioner's calculation of the $9,527,538 alternative tax was as follows:

| | |
|---|---|
| Long-term capital gains | $34,332,470.52 |
| Less: | |
| 1970 short-term capital loss | (28,461.64) |
| Less: | |
| 1969 short-term capital loss carryforward | (277,086.43) |

Alternative tax:
$28\% \times \$34,026,922.45 = \$9,527,538$

In his notice of deficiency, respondent allowed petitioner, as a capital loss carryback to 1970, all of the 1971 $3,302,766.63 reported capital loss. Respondent also allowed petitioner to include, in computing 1970 net long-term capital gain, stock sales expenses of $1,574,437.17, which petitioner had reported as expenses of its parent company. Respondent determined that, disregarding operations loss deductions, petitioner's 1969, 1970, and 1971 gains from operations, including net long-term capital gain, were as follows:[5]

| Year | Amount |
|------|--------|
| 1969 | $823,598.00 |
| 1970 | 28,765,181.79 |
| 1971 | 2,112,077.00 |

In computing petitioner's gain or loss from operations, respondent allowed the following amounts as operations loss carryovers:

| Calendar year | Total operations loss carryover |
|------|--------|
| 1969 | $823,598 |
| 1970 | 2,295,545 |
| 1971 | 0 |

The total operations loss carryover allowed for 1969 consisted of $552,451 from 1961 and $271,147 from 1962. The total operations loss carryover allowed for 1970 consisted of $841,027 from 1962, $886,225 from 1963, $328,343 from 1964, and $239,950 from 1965. In explanation of the disallowance of petitioner's claimed 1971 operations loss deduction, respondent's statutory notice stated:

In your return you claimed an operations loss deduction of $1,499,421.62 relating to reported operations losses in 1963, 1964, 1966, and 1967. It is determined that all operations losses sustained in years prior to 1971 were fully absorbed in operations loss deductions claimed or allowed in the determination of life insurance company taxable income for 1970 and prior years. Accordingly, no operations loss deduction is allowable in 1971.

---

[5]Petitioner's net long-term capital gain for 1970 was $29,149,718.65, calculated by taking into account $1,574,437.17 of sales expenses (not reported in petitioner's 1970 (return), short-term capital losses of $305,548.07 ($28,461.64 sustained in 1970 plus $277,086.43 carried over from 1969), and $3,302,766.63 capital loss carryback from 1971, and long-term capital gains of $34,332,470.52.

The parties agree that if the 1970 operations loss carryover computed in the notice of deficiency was not absorbed in 1970, the operations loss carryover available to petitioner in 1971 would consist of $886,225 from 1963 and $328,343 from 1964. They additionally agree that if the $29,149,718.65 net capital gains in 1970 is disregarded, petitioner sustained a $384,538 loss in that year. Furthermore, petitioner and respondent agree that for taxable year 1971, without taking into consideration operations loss deductions, petitioner realized a gain from operations in the amount of $2,112,077.02.

Although the specific issue before us—the effect that a life insurance company's utilization of the alternative method of computing tax on capital gains has on the absorption of operating loss deduction carrybacks and carryforwards—is one of first impression, a similar issue involving non-life insurance corporations has been decided in numerous cases. In those cases, the courts have addressed the relationship of section 172, which involves the net operating loss deduction, and section 1201(a), which concerns the alternative method of capital gains.[6]

Petitioner seeks to distinguish the instant case from those involving the similar issue in the non-life insurance corporation setting. Petitioner reasons that the phraseologies of the relevant subchapter L provisions and sections 172 and 1201(a) differ significantly, and, consequently, the decisions involving corporations other than insurance companies should be regarded as functionally inapposite to insurance companies. Respondent takes the position that the cases are analogous and contends that the holding of the Supreme Court in *United States v. Foster Lumber Co.*, 429 U.S. 32 (1976), is controlling in this case. In *Foster Lumber Co.*, the Supreme Court held that under section 172, the portion of the loss which may be carried to a succeeding year is reduced by the taxable income, including capital gains, for the first year to which it is carried

---

[6]*United States v. Foster Lumber Co.*, 429 U.S. 32 (1976); *Mutual Assurance Society of Virginia Corp. v. Commissioner*, 505 F.2d 128 (4th Cir. 1974), revg. T.C. Memo. 1973–177; *Olympic Foundry Co. v. United States*, 493 F.2d 1247 (9th Cir. 1974), affg. per curiam an unreported case (W.D. Wash. 1972, 29 AFTR 2d 72–759, 72–1 USTC par. 9299); *Naegele v. United States*, 383 F. Supp. 1041 (D. Minn. 1973), revd. by court order (8th Cir., May 5, 1977); *Chartier Real Estate Co. v. Commissioner*, 52 T.C. 346 (1969), affd. per curiam 428 F.2d 474 (1st Cir. 1970).

even though the taxpayer computes its tax by using the alternative method of computing tax on capital gains provided for in section 1201(a).[7]

---

[7]Sec. 172 provides in pertinent part as follows:

SEC. 172. NET OPERATING LOSS DEDUCTION.

(a) DEDUCTION ALLOWED.—There shall be allowed as a deduction for the taxable year an amount equal to the aggregate of (1) the net operating loss carryovers to such year, plus (2) the net operating loss carrybacks to such year. For purposes of this subtitle, the term "net operating loss deduction" means the deduction allowed by this subsection.

(b) NET OPERATING LOSS CARRYBACKS AND CARRYOVERS.—

(1) YEARS TO WHICH LOSS MAY BE CARRIED.—

(A)(i) Except as provided in clause (ii) and in subparagraphs (D), (E), (F), and (G), a net operating loss for any taxable year ending after December 31, 1957, shall be a net operating loss carryback to each of the 3 taxable years preceding the taxable year of such loss.

\* \* \* \* \* \* \*

(B) Except as provided in subparagraphs (C), (D), and (E), a net operating loss for any taxable year ending after December 31, 1955, shall be a net operating loss carryover to each of the 5 taxable years following the taxable year of such loss.

\* \* \* \* \* \* \*

(2) AMOUNT OF CARRYBACKS AND CARRYOVERS.—Except as provided in subsections (i) and (j), the entire amount of the net operating loss for any taxable year (hereinafter in this section referred to as the "loss year") shall be carried to the earliest of the taxable years to which (by reason of paragraph (1)) such loss may be carried. The portion of such loss which shall be carried to each of the other taxable years shall be the excess, if any, of the amount of such loss over the sum of the taxable income for each of the prior taxable years to which such loss may be carried. For purposes of the preceding sentence, the taxable income for any such prior taxable year shall be computed—

(A) with the modifications specified in subsection (d) other than paragraphs (1), (4), and (6) thereof; and

(B) by determining the amount of the net operating loss deduction—

(i) without regard to the net operating loss for the loss year or for any taxable year thereafter, and

(ii) without regard to that portion, if any, of a net operating loss for a taxable year attributable to a foreign expropriation loss, if such portion may not, under paragraph (1)(D), be carried back to such prior taxable year,

and the taxable income so computed shall not be considered to be less than zero. \* \* \*

\* \* \* \* \* \* \*

(c) NET OPERATING LOSS DEFINED.—For purposes of this section, the term "net operating loss" means (for any taxable year ending after December 31, 1953) the excess of the deductions allowed by this chapter over the gross income. Such excess shall be computed with the modifications specified in subsection (d).

(d) MODIFICATIONS.—The modifications referred to in this section are as follows:

(1) NET OPERATING LOSS DEDUCTION.—No net operating loss deduction shall be allowed.

(2) CAPITAL GAINS AND LOSSES OF TAXPAYERS OTHER THAN CORPORATIONS.—In the case of a taxpayer other than a corporation—

(A) the amount deductible on account of losses from sales or exchanges of capital assets shall not exceed the amount includible on account of gains from sales or exchanges of capital assets; and

(B) the deduction for long-term capital gains provided by section 1202 shall not be allowed.

174

The Supreme Court, in *Foster Lumber Co.*, recognized that sections 172 and 1201(a) each independently produce tax benefits to the corporate taxpayer but concluded that the statutory language does not require that a taxpayer receive the maximum benefit of each provision. Section 172 provides that a "net operating loss" experienced by a taxpayer in one taxable year may be deducted from "taxable income" as a carryback against the 3 previous years or as a carryforward for the 5 subsequent years. Section 11 sets forth the rates at which a corporation's taxable income, including capital gains, is normally taxed. However, under the alternative method of taxation of section 1201(a), which is utilized if a lower tax results, a corporation's tax is computed by using the section 11 rates on income other than capital gains plus a stated percentage of capital gains. The Supreme Court stated the issue in the *Foster Lumber Co.* case in terms of the relationship of these tax benefits:

The question is whether the two "tax benefit" provisions relied on by the respondent—low capital gain taxation under the alternative method and the loss carryback provision—must each be maximized independently of the other or whether Congress instead anticipated that the benefit provided by the loss deduction might on occasion be subsumed in the greater benefit provided by the alternative tax computation method. [429 U.S. 32, 40.] [8]

Sec. 1201(a) provides as follows:

SEC. 1201. ALTERNATIVE TAX.

(a) CORPORATIONS.—If for any taxable year a corporation has a net section 1201 gain, then, in lieu of the tax imposed by sections 11, 511, 821(a) or (c), and 831(a), there is hereby imposed a tax (if such tax is less than the tax imposed by such sections) which shall consist of the sum of a tax computed on the taxable income reduced by the amount of the net section 1201 gain, at the rates and in the manner as if this subsection had not been enacted, plus—

(1) in the case of a taxable year beginning before January 1, 1975—

(A) a tax of 25 percent of the lesser of—

(i) the amount of the subsection (d) gain, or

(ii) the amount of the net section 1201 gain,

and

(B) a tax of 30 percent (28 percent in the case of a taxable year beginning after December 31, 1969, and before January 1, 1971) of the excess (if any) of the net section 1201 gain over the subsection (d) gain; and

(2) in the case of a taxable year beginning after December 31, 1974, a tax of 30 percent of the net section 1201 gain.

[8]When ordinary income exceeds the available net operating loss deduction, the taxpayer will receive full benefit of the deduction. When ordinary income is less than the available net operating loss deduction, the shortfall is absorbed by capital gains but the taxpayer will not receive an incremental tax reduction.

Foster Lumber Co.'s income tax return showed income, gains, and losses for 1966 through 1968 as follows:

| Year | Ordinary income loss | Capital gains | Total gains or losses |
|---|---|---|---|
| 1966 | $7,236 | $166,635 | $173,871 |
| 1967 | 114,262 | 114,656 | 228,918 |
| 1968 | (42,203) | 0 | (42,203) |

The taxpayer argued that it was entitled to carry back its 1968 net operating loss to 1966 and to offset it against its 1966 ordinary income, exclusive of capital gains. This approach would result in $34,967 in net operating loss remaining to carry over to the succeeding year to offset ordinary income earned in 1967. The taxpayer contended that since it computed its 1966 tax under the alternative method provided for in section 1201(a), the capital gain was not a part of the "taxable income" used to absorb its net operating loss carryback. The Government asserted that taxable income for 1966, which the net operating loss carryback reduced, included the capital gain and that therefore the entire loss carryback was used in 1966, and no part was available to carry over to 1967.[9]

The Supreme Court based its holding on the plain meaning of the statutes, the legislative history of the statutes, and recognition that net operating losses are "wasted" in other situations. The Supreme Court discussed its interpretation of the following language of section 172:

The portion of such loss which shall be carried to each of the other taxable years shall be the excess, if any, of the amount of such loss over the sum of the taxable income for each of the prior taxable years to which such loss may be carried. * * *

The Court stated that the term "taxable income" as used in this provision must be read to conform with its definition in

[9]The Supreme Court's holding in *United States v. Foster Lumber Co.*, *supra*, reversed the holding of the Eighth Circuit and is contrary to our holding in *Chartier Real Estate Co. v. Commissioner*, *supra*, and a number of cases following that holding and the holdings in *Olympic Foundry Co. v. United States*, *supra*; *Data Products Corp. v. United States*, an unreported case (C.D. Cal. 1974, 34 AFTR 2d 74–6058, 74–2 USTC par. 9759), affd. in an unpublished opinion (9th Cir., Dec. 27, 1974); and *Naegele v. United States*, *supra*. We had held in *Chartier Real Estate Co.* and other courts had held that the net operating loss deduction carryback or carryforward exhausted only the ordinary income to which the loss was actually applied.

section 63(a); it must include both ordinary income and capital gains.[10] The Court discussed the policy considerations involved in sections 172 and 1201(a) and the legislative history of these sections and concluded that both supported its holding that the plain meaning of the statutes required the decision it reached.

We have considered petitioner's argument that the holding in *Foster Lumber Co.* is not controlling in this case, and we find the argument unpersuasive. The parallelisms between the tax benefits, functions, and language of sections 172 and 1201(a), and those of sections 802 and 812, which are involved in the instant case, dictate a conclusion contrary to petitioner's position.

Section 802(a) sets forth the regular tax imposed on life insurance company taxable income and the alternative tax, if less, imposed in lieu of the regular tax when the company realizes net capital gains. Section 802(b) defines life insurance company taxable income (LICTI) as including taxable investment income (as defined in section 804(a)(2)) and gain from operations (as defined in section 809(b)(1)). In pertinent part, the statutes provide:

SEC. 802. TAX IMPOSED.

(a) TAX IMPOSED.—

(1) IN GENERAL.—A tax is hereby imposed for each taxable year beginning after December 31, 1957, on the life insurance company taxable income of every life insurance company. Such tax shall consist of a normal tax and surtax computed as provided in section 11 as though the life insurance company taxable income were the taxable income referred to in section 11.

(2) ALTERNATIVE TAX IN CASE OF CAPITAL GAINS.—If for any taxable year beginning after December 31, 1961, the net long-term capital gain of any life insurance company exceeds the net short-term capital loss, then, in lieu of the tax imposed by paragraph (1), there is hereby imposed a tax (if such tax is less than the tax imposed by such paragraph) which shall consist of the sum of—

(A) a partial tax, computed as provided by paragraph (1), on the life insurance company taxable income determined by reducing the taxable investment income, and the gain from operations, by the amount of such excess, and

---

[10]The Supreme Court rejected Foster Lumber Co.'s argument that it should find as we did in *Chartier Real Estate Co. v. Commissioner, supra*, that "taxable income" refers only to that ordinary income offset by a loss deduction which produces an additional reduction in tax liability under the alternative tax method of sec. 1201(a).

(B) an amount determined as provided in section 1201(a) on such excess.

*   *   *   *   *   *   *

(b) LIFE INSURANCE COMPANY TAXABLE INCOME DEFINED.—For purposes of this part, the term "life insurance company taxable income" means the sum of—

(1) the taxable investment income (as defined in section 804), or, if smaller, the gain from operations (as defined in section 809),

(2) if the gain from operations exceeds the taxable investment income, an amount equal to 50 percent of such excess, plus

(3) the amount subtracted from the policyholders' surplus account for the taxable year, as determined under section 815.

SEC. 804. TAXABLE INVESTMENT INCOME.

(a) IN GENERAL.—

(1) EXCLUSION OF POLICYHOLDERS' SHARE OF INVESTMENT YIELD.[11]— The policyholders' share of each and every item of investment yield (including tax-exempt interest, partially tax-exempt interest, and dividends received) of any life insurance company shall not be included in taxable investment income. For purposes of the preceding sentence, the policyholders' share of any item shall be that percentage obtained by dividing the policy and other contract liability requirements by the investment yield; except that if the policy and other contract liability requirements exceed the investment yield, then the policyholders' share of any item shall be 100 percent.

(2) TAXABLE INVESTMENT INCOME DEFINED.—For purposes of this part, the taxable investment income for any taxable year shall be an amount (not less than zero) equal to the amount (if any) by which the net long-term capital gain exceeds the net short-term capital loss plus the sum of the life insurance company's share of each and every item of investment yield (including tax-exempt interest, partially tax-exempt interest, and dividends received), reduced by—

(A) the sum of—

(i) the life insurance company's share of interest which under section 103 is excluded from gross income,

(ii) the deduction for partially tax-exempt interest provided by section 242 (as modified by paragraph (3)) computed with respect to the life insurance company's share of such interest, and

(iii) the deductions for dividends received provided by sections 243, 244, and 245 (as modified by paragraph (5)) computed with respect to the life insurance company's share of the dividends received; and

(B) the small business deduction provided by paragraph (4).

---

[11]The term "investment yield" is defined in sec. 804(c) and provides in part:

SEC. 804(c). INVESTMENT YIELD DEFINED.—For purposes of this part, the term investment yield means the gross investment income less the following deductions—

(1) INVESTMENT EXPENSES. * * *

(2) REAL ESTATE EXPENSES. * * *

(3) DEPRECIATION. * * *

(4) DEPLETION. * * *

(5) TRADE OR BUSINESS DEDUCTIONS. * * *

SEC. 809. IN GENERAL.

(b) GAIN AND LOSS FROM OPERATIONS.—

(1) GAIN FROM OPERATIONS DEFINED.—For purposes of this part, the term "gain from operations" means the amount by which the sum of the following exceeds the deductions provided by subsection (d):

(A) the life insurance company's share of each and every item of investment yield (including tax-exempt interest, partially tax-exempt interest, and dividends received);

(B) the amount (if any) by which the net long-term capital gain exceeds the net short-term capital loss; and

(C) the sum of the items referred to in subsection (c).

Section 812 sets forth rules which allow life insurance companies to deduct their operations losses and to carry forward or carry back excess operations losses. In relevant part, section 812 provides:

SEC. 812. OPERATIONS LOSS DEDUCTION.

(a) DEDUCTION ALLOWED.—There shall be allowed as a deduction for the taxable year an amount equal to the aggregate of—

(1) the operations loss carryovers to such year, plus

(2) the operations loss carrybacks to such year.

For purposes of this part, the term "operations loss deduction" means the deduction allowed by this subsection.

(b) OPERATIONS LOSS CARRYBACKS AND CARRYOVERS.—

(1) YEARS TO WHICH LOSS MAY BE CARRIED.—

(A) IN GENERAL.—The loss from operations for any taxable year (hereinafter in this section referred to as the "loss year") beginning after December 31, 1954, shall be—

(i) an operations loss carryback to each of the 3 taxable years preceding the loss year,

(ii) an operations loss carryover to each of the 5 taxable years following the loss year, and

(iii) subject to subsection (e), if the life insurance company is a new company for the loss year, an operations loss carryover to each of the 3 taxable years, following the 5 taxable years described in clause (ii).

\*       \*       \*       \*       \*       \*       \*

(2) AMOUNT OF CARRYBACKS AND CARRYOVERS.—The entire amount of the loss from operations[12] for any loss year shall be carried to the earliest

---

[12]The term "loss from operations" is defined in sec. 809(b)(2) as follows:

SEC. 804(b). GAIN AND LOSS FROM OPERATIONS.—

\*       \*       \*   .   \*       \*       \*       \*

(2) LOSS FROM OPERATIONS DEFINED.—For purposes of this part, the term "loss from operations" means the amount by which the sum of the deductions provided by subsection (d) exceeds the sum of—

of the taxable years to which (by reason of paragraph (1)) such loss may be carried. The portion of such loss which shall be carried to each of the other taxable years shall be the excess (if any) of the amount of such loss over the sum of the offsets (as defined in subsection (d)) for each of the prior taxable years to which such loss may be carried.

(d) OFFSET DEFINED.—

(1) IN GENERAL.—For purposes of subsection (b)(2), the term "offset" means, with respect to any taxable year, an amount equal to that increase in the operations loss deduction for the taxable year which reduces the life insurance company taxable income (computed without regard to section 802(b)(3)) for such year to zero.

(2) OPERATIONS LOSS DEDUCTION.—For purposes of paragraph (1), the operations loss deduction for any taxable year shall be computed without

---

(A) the life insurance company's share of each and every item of investment yield (including tax-exempt interest, partially tax-exempt interest, and dividends received);

(B) the amount (if any) by which the net long-term capital gain exceeds the net short-term capital loss; and

(C) the sum of the items referred to in subsection (c).

\*　　\*　　\*　　\*　　\*　　\*　　\*

(c) GROSS AMOUNT. \* \* \*

(1) PREMIUMS. \* \* \*

(2) DECREASES IN CERTAIN RESERVES. \* \* \*

(3) OTHER AMOUNTS. \* \* \*

(d) DEDUCTIONS. \* \* \*

(1) DEATH BENEFITS, ETC. \* \* \*

(2) INCREASES IN CERTAIN RESERVES. \* \* \*

(3) DIVIDENDS TO POLICYHOLDERS. \* \* \*

(4) OPERATIONS LOSS DEDUCTION. \* \* \*

(5) CERTAIN NONPARTICIPATING CONTRACTS. \* \* \*

(6) CERTAIN ACCIDENT AND HEALTH INSURANCE AND GROUP LIFE INSURANCE. \* \* \*

(7) ASSUMPTION BY ANOTHER PERSON OF LIABILITIES UNDER INSURANCE, ETC., CONTRACTS. \* \* \*

(8) TAX-EXEMPT INTEREST, DIVIDENDS, ETC. \* \* \*

(9) INVESTMENT EXPENSES, ETC. \* \* \*

(10) SMALL BUSINESS DEDUCTION. \* \* \*

(11) CERTAIN MUTUALIZATION DISTRIBUTIONS. \* \* \*

(12) OTHER DEDUCTIONS. \* \* \*

Sec. 1.812–4(a)(5), Income Tax Regs., provides in pertinent part as follows:

Sec. 1.812–4. Operations loss carrybacks and operations loss carryovers.

(a) *In general* \* \* \*

\*　　\*　　\*　　\*　　\*　　\*　　\*

(5) *Amount of loss to be carried.* The amount which is carried back or carried over to any taxable year is the loss from operations to the extent it was not absorbed in the computation of gain from operations for other taxable years, preceding such taxable year, to which it may be carried back or carried over. For the purpose of determining the gain from operations for any such preceding taxable year, the various operations loss carryovers and carrybacks to such taxable year are considered to be applied in reduction of the gain from operations in the order of the taxable years from which such losses are carried over or carried back, beginning with the loss for the earliest taxable year.

regard to the loss from operations for the loss year or for any taxable year thereafter.

On brief, petitioner argues that terms of art utilized in the above subchapter L provisions differ from those utilized in sections 172(b) and 1201(a) and that such phraseology variances cause the statutes to operate dissimilarly. For example, petitioner asserts that the concept of taxable income within section 1201(a) is inapposite to the section 802(a)(2)(A) concept of LICTI. Petitioner focuses on the section 802(a)(2)(A) calculation that "the life insurance company taxable income [is] *determined* by reducing the taxable investment income, and the gain from operations, by the amount of such excess," while the section 1201(a)(1) "taxable income [is] *reduced* by the amount of net capital gain." (Emphasis added.) Petitioner takes the position that the section 802(b) LICTI definition applies when determining the regular tax of section 802(a)(1), but for purposes of section 802(a)(2), LICTI is redefined and the section 802(b) definition is inapplicable. Petitioner reasons that the word "determined" as used in section 802(a)(2)(A) connotes a recalculation and redefinition of LICTI.

We disagree with petitioner's contention that the term LICTI has one definition for purposes of section 802(a)(1) and another definition for purposes of section 802(a)(2)(A). Section 802(b) specifically states that, without exception, the LICTI definition therein applies "for purposes of this part [subchapter L, sections 801 through 820, which involve the income taxation of life insurance companies]." The section 802(a)(2)(A) phrasing is simply an instruction that, in calculating the lower alternative tax on capital gains, ordinary income sources must be separated from capital gains; the ordinary income is taxed at the section 11 taxation rates while net capital gain is taxed at the lower section 1201(a) rate.[13] This segregated calculation operates in a manner parallel to the section 1201(a) alternative tax calculation applicable to non-life insurance companies.

Another example to which petitioner refers to distinguish the subchapter L provisions from sections 172(b) and 1201(a) concerns the terms "offset" and "taxable income," as utilized

---

[13]See S. Rept. 2109, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 1180, 1186.

respectively in the second sentence of section 812(b)(2) and in the second sentence of section 172(b).[14] On brief, petitioner contends that these terms are not essentially equivalents. Petitioner connects the definition of "offset" with its interpretation of the term LICTI as used in section 802(a)(2)(A) and suggests that, as defined by section 812(d), the term "offset" must exclude long-term capital gain. By way of contrast, petitioner states that the term "taxable income" includes capital gain.

We disagree with petitioner's arguments. We are of the opinion that while "offset" and "taxable income" are not comparable terms, "offset," as used in section 812(b)(2), serves the same purpose as the "excess * * * of the amount of such [net operating loss carryover or carryback] loss over * * * taxable income" used in section 172(b). "Taxable income," under section 172(b), is used to reduce or offset the net operating loss carryover.[15] The section 812 term "offset" is defined with reference to the LICTI for the year. "Taxable income" for corporations other than life insurance companies includes capital gains; LICTI for insurance companies includes capital gains. The use of the alternative method of computing tax on capital gains in each instance is merely a different method of computing the tax on the income. Use of this method has not changed "taxable income" or LICTI. We therefore do not accept petitioner's argument that differences in the wording of the provisions of the Code applicable to insurance companies and those applicable to other corporations distinguish this case from the *Foster Lumber Co.* case. In *United States v. Foster Lumber Co., supra,* the Supreme Court held that the alternative tax on capital gains is a computation of tax and not a change in the amount of "taxable income." Here, the similar provisions of section 802(a)(2) under the

---

[14]Sec. 172(b)(2) provides that the "excess * * * of the amount of such loss over the sum of the taxable income for each of the prior taxable years" is used to determine the loss carryover or carryback remaining to be used in a later year. Sec. 812(d) defines "offset" as "an amount equal to that increase in the operations loss deduction for the taxable year which reduces the life insurance company taxable income * * * for such year to zero." Sec. 812(b) provides that the loss to be carried forward or back is the "excess * * * of the amount of such loss over the sum of the offsets * * * for each of the prior taxable years to which such loss may be carried."

[15]See also sec. 1.812–4(a)(5), Income Tax Regs.

rationale of the Supreme Court must likewise be considered a computation of tax and not a change in the amount of LICTI.

A comparison of the specific statutory terminology is but one factor to consider. In addition, focus should be on the purposes, tax benefits, and functions of the statutes herein involved as compared to sections 172(b) and 1201(a). By their very terms, the purposes, tax benefits, and operations of the sections 802(a)(2) and 1201(a) alternative tax provisions are the same—to place a ceiling on the rates of tax on capital gains in order to stimulate capital formation and business. The committee reports which explain the taxation scheme of section 802 confirm this.[16] Before 1959, life insurance companies did not pay tax on net long-term capital gains.[17] From 1959 to 1962, section 802 provided the only procedure for taxation of net capital gains; it taxed net long-term capital gains at a flat rate of 25 percent. This tax treatment operated to the detriment of a large portion of the life insurance companies since many life insurance companies actually operated at a loss while realizing net long-term capital gain. The statute required such life insurance companies to pay a flat 25-percent tax on the net capital gain even though the companies operated at an overall loss for the year. In 1962, Congress amended section 802 to conform with the taxation scheme imposed upon other corporations. As amended, section 802(a) provides regular and alternative tax methods. Under the regular method, added in 1962, the tax was imposed on life insurance company taxable income at the regular tax rates of section 11; by comparison, the alternative tax was computed in part on net capital gain and in part on other life insurance company taxable income. In 1969, Congress modified the language of section 802(a)(2) to provide that as to the portion of alternative tax on net capital gains, the amount of tax must be calculated as provided in section 1201(a).[18] From this statutory evolution, it is clear that with respect to capital gains, Congress intended to place life insurance company taxation on a parity with other corporations by having the section 802(a)(2)

---

[16]S. Rept. 2109, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 1180, 1186; H. Rept. 2542, 87th Cong., 2d Sess. 4 (1962), 1962–3 C.B. 1193, 1195–1196.

[17]See H. Rept. 34, 86th Cong., 1st Sess. (1959), 1959–2 C.B. 736, 747.

[18]See S. Rept. 91–552, 91st Cong., 1st Sess. (1969), 1969–3 C.B. 423, 546.

alternative tax conform and function in a manner parallel to the operation of section 1201(a).

Similarly, Congress intended the purpose, tax benefit, and function of the section 812(b)(2) operations loss carryforward and carryback provision to operate in a fashion consistent with the operation of section 172(b)(2). This is clearly indicated by the nearly identical phrasing which Congress utilized in these statutes[19] and by the language of section 812(f). Section 812(f)[20] provides that—

Except as provided in section 809(e), subtitle A and subtitle F shall apply in respect of operations loss carrybacks, operations loss carryovers, and the operations loss deduction under this part in the same manner and to the same extent as such subtitles apply in respect of net operating loss carrybacks, net operating loss carryovers, and the net operating loss deduction.

That provision confirms that in the life insurance company area, section 812(b)(2) acts as a substitute for section 172(b) as applied to other corporations. Certainly, each of these statutes is an income averaging device which allows the taxpayer to offset its lean years against its lush years so that over a number of years the taxpayer realizes a more equalized tax treatment. For the above reasons we do not agree with petitioner's contention that the reasoning of the *Foster Lumber Co.* case should not apply to a life insurance company. Much of petitioner's argument is comparable to the reasoning used by this Court and other courts in opinions which were overruled by the *Foster Lumber Co.* case and to the reasoning of Justice Blackmun in his dissent in *Foster Lumber Co.* However persuasive these arguments might seem, they were rejected by the majority of the Supreme Court. We hold that

---

[19]In relevant part, sec. 172(b)(2) states that—

The portion of such loss which shall be carried to each of the other taxable years shall be the excess, if any, of the amount of such loss over the sum of the taxable income for each of the prior taxable years to which such loss may be carried. * * *

Sec. 812(b)(2) in pertinent part provides:

The portion of such loss which shall be carried to each of the other taxable years shall be the excess (if any) of the amount of such loss over the sum of the offsets (as defined in subsection (d)) for each of the prior taxable years to which such loss may be carried.

[20]See also H. Rept. 34, 86th Cong., 1st Sess. (1959), 1959–2 C.B. 736, 750, 786, which states that the "operations loss deduction [of sections 809 and 812] * * * is similar to the net operating loss deduction available to corporations generally."

petitioner's operations losses were fully absorbed in 1970 by life insurance company taxable income, and no operations losses remain to be carried forward to 1971.

*Decision will be entered for the respondent.*